Good morning, everyone. We have a full day today. We have six cases for decision, five will be orally argued, and our plan, which I think we'll stick to, but sometimes can change, is we would take a 10 or 12 or 13-minute break after the ad health case, so after the third argument, but stay nearby in the hallway just in case. And with that, I will call our first case, St. Mary's Catholic v. Roy. It is 24-12-67. Counsel, when you're ready, please proceed. Good morning, and may it please the Court. My name is Nicholas Reeves, representing Appellants. I will endeavor to reserve three minutes for a little. Starting in 2023, Colorado's Universal Preschool Funding Program made it free for parents to send their four-year-olds to any of nearly 2,000 public or private preschools across the state. But defendants have barred the door to the Archdiocese of Denver's preschools on account of their religious exercise. This has had real effects. One Catholic preschool has already closed. Enrollment is dropping across the Archdiocese's preschools, and plaintiffs Daniel and Lisa Sheely have been denied this universal benefit solely because they send their children to a Catholic preschool. The most straightforward way to resolve this case is under Carson v. Macon. Colorado has created a generally available benefit and denied Catholic preschools and families that benefit based on their religious exercise. But Carson deals with explicit rather than incidental religious burdens. So how does Carson and not Smith control this case? I think Carson controls because what the Supreme Court said there is, quote, regardless of how the benefit and restriction are described, the program operates to identify and exclude otherwise eligible schools based on their religious exercise. So I think the key takeaway from Carson is not whether it's an explicit rule, but whether the school is excluded on account of their religious exercise. Maine actually made the same argument that Colorado is making here in Carson itself. And the First Circuit agreed with Maine, but the Supreme Court reversed and said there's no distinction whether it's, you know, a kind of categorical religious exclusion or not. And I think that makes sense because, you know, while Carson is rooted in the line of cases that precedes and continues after Smith, I actually think it makes sense under Smith's rubric as well. If Colorado has made virtually every preschool in the state free except for a handful of religious preschools, they've in some ways raised the floor. And so now we are talking about, you know, you could call it discrimination or exclusion or a lack of neutrality towards religious schools in particular because Colorado has, like I said, raised the floor for everybody else. But I would like to talk about our other arguments under Smith itself. And I think I would start with our claim under Tandon versus Newsom. So the rule coming out of Tandon is that if the government allows comparable secular exceptions from a law, it can't deny a religious accommodation unless it shows or has satisfied strict scrutiny. And Tandon itself tells us how to determine whether a secular exception is comparable. It says, quote, whether two activities are comparable for purposes of the free exercise clause must be judged against the asserted government interest that justifies the regulation at issue. Here we're talking about one sentence in Colorado's regulation, in Colorado statute. And that sentence tells us explicitly what the government's interest is and what the interest of the Colorado legislature was when they passed this. It says that preschools who participate in this program have to give equal access regardless of a list of protected characteristics. And so any exceptions from, any exceptions that would allow unequal treatment on the basis of those protected characteristics would be comparable under Tandon. What is the evidence that any of these preferences, which I understand function as exceptions to the algorithm, actually operate as exceptions to the mandate? Thank you for that question. I'd like to kind of disaggregate two different things. So there are, there's evidence in the record that over a thousand preschools have an exception from the algorithm, like you were saying. I don't even take Colorado to be disputing that they're allowing preschools to participate in the UPK program, even if they give preference based on disability or income level, and even religion. None of those are disputed in the record below. And if you look at the trial testimony, defendant O'Dean, who testified in this case, made clear that they interpret the mandate to mean that they can preference families or groups based, because they've historically been discriminated against. That's, if anything, a very open-ended standard, not a rule. And so if Colorado is making a decision as to who they think has historically been discriminated against and applying that to let preschools in and out, I think that's, that's clear they have discretion and clarity. So are you suggesting that that's the, that's sort of sole discretion that Fulton contemplates? So actually, I think the Fellowship of Christian Athletes decision speaks to this. I don't think Fulton is limited to situations where the government has complete or sole discretion. Even the language in Fulton itself said, you know, when the government can pick and choose or make individualized determinations. And then it said, in this case, it was sole discretion. So I don't think the rule coming out of Fulton is that you have to have complete or sole discretion. And as I was starting to say, the Fellowship of Christian Athletes en banc decision from the Ninth Circuit says exactly the same thing there. That was a heavily split decision, though. So you're, you're not asking us to necessarily follow that decision. We're not bound by that decision. You're not bound by that decision, but I think it's, it's very, very persuasive precedent on, on very similar facts. I believe it was either, you know, ultimately eight to one, and there were a couple of concurrences as well, but it was an en banc decision from, I think it was 11 judges on the Ninth Circuit. So, you know, in addition to the Fellowship of Christian Athletes, I think the Sixth Circuit's decision in Monclova Christian also helps to explain how Tandon works in this case. What the Sixth Circuit said is you can't look myopically solely at the restriction that burdens religion. You have to look more broadly at the statute and even other exceptions that are elsewhere in the statute. In Monclova, there was a specific provision that regulated religious schools, and there were separate provisions that regulated, you know, different stores and things like that. And what the court said is even if they're different places in the same statutory scheme, that, those exceptions can still be comparable. Here, I think this is an even easier case, because as I was saying, it's, it's a single sentence in the Colorado statute, and it treats all of them the same. And I think this is clear from the record below. In, in the, during trial in this case, the defendants never distinguished between different characteristics and said some are more important than others. And, in fact, in testimony in a parallel case called Darren Patterson Christian Academy, the same defendants who are here in this case explicitly testified that they had an identical interest in all of the different provisions and that no single protection was more important than any other. Counsel, can I ask you about the Odeen testimony you referenced? Because it seems that your brief and some of the amicus briefs give a lot of weight to what Ms. Odeen testified to regarding discretionary exemptions, particularly the one, as you mentioned, that, that seems to be premised upon race. And I just wonder, how do we interpret the weight to give that testimony when she was responding to, you know, very skillful questioning of counsel to hypotheticals, but then, and redirect, not only walk that back, but across the board it seemed to me the Colorado officials were, I think the district court said, unwavering in their assertion that there could not be any exemptions to the equal opportunity requirement. So even though she sort of off the cuff gave those hypothetical questions that response, that there would be a process to go through, and at the end of the day, in consultation with counsel, they would never grant that actual exemption. So how much weight do we give that type of testimony in the record? Yeah, I think the testimony, if you, if you read it all together as it seems like you have, actually tells a very straightforward story. What Mrs. Mizzodine testified to initially was that she was interpreting the mandate in a way that would allow Colorado to grant preferences for historically discriminated against groups. And she was just applying that rule to the hypotheticals that counsel for the plaintiffs put to her at the time. Her later testimony basically said, well, we've never actually confronted those situations before. I'd have to talk to other people on my team, and I wouldn't grant exceptions that violate my understanding of what the law requires. And I think if you read that all together, it's, it's clear that she said, she's saying we would allow preferences to support this interest, this interest in helping historically discriminated against groups. And she's saying if, if it doesn't support those historically discriminated against groups, then it would violate the law. So I actually don't think there's any, any contradiction between what she testified on a cross-examination and on redirect. Is that just a question of statutory interpretation that you disagree with Judge Kane and with Mizzodine on? The, what that language means, regardless of? I do think this court can look at the statute and make its own assessment of what it means. I think it is to some extent a question of what the statute says. But, you know, I think looking at the express terms and, you know, looking at, like you said, the word regardless, there's no distinction made. And I don't think this court even has to just reinterpret the statute. It can look at what defendants said below. Now before this court, they are saying that you should treat disability and income level differently. That was not their argument in the district court. Their argument was, as I was explaining a minute ago, that we're interpreting this to mean we can grant preferences to favor historically discriminated against groups, regardless of the characteristics. And are you contending that Judge Kane misinterpreted the statute? Yes, I think that's right, Your Honor. I don't think this court needs to rely solely on that or to reverse that particularly, especially when defendants have conceded kind of broader discretion. So how precisely did he misinterpret the statute? Well, Your Honor, I think this, I mean, the statutory text as I read it is actually very clear. You know, it says each preschool provider must provide children with an equal opportunity to enroll and receive services regardless of, and then it lists the protected characteristics. Under this court's decisions like Etherton v. Owens, this court has said that when you're interpreting Colorado law, you look primarily to the plain text and to the express language itself. What the district court seemed to think is that you could look at other provisions in the statute to essentially use those to contradict this express language. Nothing elsewhere in the statute contradicts this express language. You need to explain to me the express language and why you think that's plain in your favor. Because one reading would be received services regardless of race, ethnicity, so forth, would mean you can't discriminate against someone because they have that characteristic. And otherwise it's wide open. I see my time is running. Can I answer a question and then reserve some time for rebuttal? Please. Yes, Your Honor. So I think even if we were to say that maybe disability is different, the text itself doesn't say low income or something like that. It says income level. And I think that's clear that it's saying you can't distinguish based on income level. And I also think the examples that Colorado itself points to aren't actually comparable. They say, well, there are other statutes where we're talking solely about discrimination against someone because of their disability or favoring low income individuals. But the statutes they point to are distinguishable on exactly that ground because they have specific one-way ratchet language that's absent here. There's nothing in the statutory provision about discrimination. There's nothing in the statute against a particular group. It says regardless of. And I think even beyond that, just taking a quick step back, the fact that Colorado testified, and I think this is very undisputed, that they would have to consider, you know, race and sexual orientation, gender identity on a case-by-case basis, that itself is another form of discretion. And they have not argued that those exceptions are one-way ratchets. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Helen Norton for the State of Colorado representing the appellees. The plaintiffs here ask this Court to do what no appellate court has ever done, create a First Amendment right for publicly funded schools to exclude and expel children because of those children's or their parents' protected class status. Such a right does not exist here for three reasons. First, the equal opportunity requirements treat religious and secular providers exactly the same and are thus neutral and generally applicable. Second, the equal opportunity requirements do not significantly burden plaintiffs' ability to communicate their views. And finally, for these reasons, rational basis review applies and the equal opportunity requirements can satisfy this and indeed any level of review. Counsel, how should we be thinking about the congregation preference? Is that out of the  Is that? Out of the case. The congregation preference is out of the case. There is now no exception of any sort to the equal opportunity requirements, and this is one of many reasons why the equal opportunity requirements are neutral and generally applicable. Even when it was in the case before it was repealed because the department came to understand it was an inadvertent exception to the religious affiliation provision. Even when it was in the case, it did not trigger strict scrutiny because Fulton holds that to show that a program is not generally applicable means showing that the government has prohibited religious conduct while permitting secular conduct that undercuts the government's asserted interests in similar ways. The purpose of general applicability inquiry is to make sure that the government is not devaluing religion, to make sure that the government is not selectively burdening religion compared to secular providers. The congregation preference did no such thing. It favored religious providers over secular providers. It was the product of the department's good faith and enthusiastic effort to facilitate faith-based providers' inclusion into the program. Does that matter or is an exception an exception? Pardon me? Does that matter or is an exception an exception? It does matter. The exceptions that matter, Fulton tells us, are those that prohibit religious conduct while permitting secular conduct that undermines the government's asserted in the same ways. To consider that the government's efforts to include faith-based providers should trigger suspicion under the free exercise clause turns the objectives of general applicability on its head and would only discourage government from trying to accommodate and encourage religion in the first place. Are you saying that Judge Kaine was mistaken in his ruling on the congregation exception? No, Your Honor, we are not. Judge Kaine ruled that although the department's efforts in creating the congregation preference were good faith efforts, they introduced, inadvertently for the first time, an exception to the religious affiliation provision because by providing a preference that was available only to faith-based providers because they were faith-based providers, it was just drawing a distinction on the basis of religious affiliation. The statute permits no exceptions and for that reason the department repealed the preference. Could the community preference that still exists serve as like a functional equivalent to the congregation preference? No, Your Honor. The community preferences are available to faith-based providers just as they are available to all providers and they permit those providers to save seats for members of their communities so long as they do not define their communities on the basis of protected characteristics. So a school couldn't say we preference members of our parish community, for example? No, Your Honor. As Judge Kaine ruled, to do so would be distinguishing on the basis of religious affiliation. What faith-based providers could do, like any other provider, is save seats for members of their neighborhood, could save seats for the children of their preschool's employees, could save seats for the siblings of current students and all of the other preferences that are available to all providers, religious or secular. And what's common to all of these preferences is that they must not draw distinctions on the basis of protected characteristic. What do you say to the appellant's argument here that Carson is the case that should guide our inquiry? Carson is entirely distinguishable from this case. The state in Carson said literally no schools that provide religious instruction need apply. And the other two cases in the Carson Trilogy, the state said explicitly no religious actors need apply. UPK does no such thing. It includes and welcomes faith-based providers. More than 40 faith-based providers currently participate, along with six Catholic Charities preschool providers. Moreover, UPK is also different from the other situations in which the Supreme Court has held that the government's action was not neutral. Unlike Lukumi, unlike the other cases in this string, there are no statements of religious animus by any decision-maker in this case. Unlike Lukumi, where the ordinance was motivated by public outcry and fear of the Santeria church moving into their community, the creation of the UPK program had nothing to do with any concerns about religious actors, and instead about ensuring that all four-year-old Coloradans had access to free, publicly funded preschool. Counsel, what about the health and safety exemption? As I understand the argument in the district court's finding regarding that particular exemption, it was that by denying equal access, it was a threat to the health and safety of these children and their families. I think the argument is essentially their mental health for suffering from discrimination, but why couldn't we sort of deem that as an implicit animus towards Catholic doctrine as it relates to human sexuality and gender identity, that if you're calling, you know, them exercising that doctrine a threat to the health of children and their families? Is that implicit animus in any way? No, sir. No, Your Honor. Nothing in the UPK program, nothing in the department's implementation of the program, nothing in the expert testimony argued that religious beliefs or doctrine or curriculum or teachings of any sort is harmful. What the statute regulates and what the department implements is conduct that denies equal opportunity on the basis of protected characteristic, and conduct here means excluding or expelling children because of their protected class status or the protected class status of their parents. And, Counsel, can I return to the discussion we had with Mr. Reeves about the testimony of Ms. O'Dean and this idea of some exemptions for individual preferences and how those could be sorted out? And the question I asked him, I would ask for you as well, which is how much weight do we give, not just to the record, but the district court's findings about whether or not there could be exemptions to the EEO mandate when, when faced with hypotheticals, Ms. O'Dean seemed to say that, in fact, that there may, in fact, be discretion for the department to grant those exemptions based upon different things such as historically discrimination to sort of remedy that. Yes, Your Honor. The department has no such discretion. Ms. O'Dean's testimony made clear that before that morning at trial, she had never considered, much less received a request for preferences of the type that were posed in the hypotheticals. Her testimony before, during, and after that colloquy made clear that the department will not approve any preference that draws distinctions that are prohibited by the equal opportunity requirements. Her testimony also made clear that she does not approve preferences on her own, she could not approve preferences on her own, and that any decision would be made by a consultation with senior leadership and counsel. The district court found her testimony credible on these fronts, found that her on-the-fly response to hypotheticals she had never considered had no relationship to how the department actually determines preferences, and the district court's determination are subject only to clear error review. Your Honor, I'd like to return to general applicability and address the preferences regarding disability and income. As Judge Phillips noticed, this is a question of statutory interpretation. What does it mean when the statute says that providers have to ensure equal opportunity regardless of disability and regardless of income status? Department interprets that to mean that the protected characteristic is having a disability, not not having a disability, and that the protected characteristic is being of a low income status and not high income status. So under this interpretation for a Head Start provider to prioritize children from low income families is not denying children equal opportunity on the basis of their income status. This interpretation is consistent with the statutory text, which both expressly identifies its primary objectives to include ensuring and expanding access to preschool, publicly funded preschool, for children with disabilities and children from low income families. The statutory text also expressly requires the inclusion of Head Start providers in the program and expressly requires the inclusion of providers who serve children with disabilities in the program. This interpretation is also consistent with longstanding interpretation under other statutes like the Americans with Disabilities Act and so forth. Plaintiffs want this court to understand this statute to prohibit the participation of Head Start providers and to prohibit the participation of providers that serve children with disabilities. When to do so would turn the statutory text and its objectives on their head. What about that income level? You're suggesting that it would discriminate if it's a low income level. Why wouldn't it be discrimination to say, sorry you make too much, your parents make too much money so you can't come to our school? Yes, Your Honor. The department interprets the statutory language requiring equal opportunity regardless of income status. The protected characteristic under the department's interpretation is low income status. And again, consistent with the repeated statutory identification of its primary objectives to expand and ensure access to children from low income families in the program. And the statute's direct requirement that Head Start providers who prioritize low income children should be included in the program. To interpret the statute otherwise would mean the denial to the exclusion of Head Start from the program because they serve deliberately children from low income families. If Colorado were to lose this appeal and then struck its individual provider preferences, where would we be? You're talking about the preferences that are available to children, the siblings of children, the preferences that are available. All of them listed in Judge Gaines' order. Yes. Well then we would be back at the results of the default algorithm, which would sort, would match families with providers based either on a random basis or on a first come, first serve basis. And the preferences were designed to overcome those unintended consequences of the algorithm to make sure that, for example, school districts could serve only children and families that lived within the school district's boundaries. To ensure that preschools could save seats for the children of their preschool employees, their preschool teachers, to ensure continuity of care. To ensure that preschools, if they so choose, could save seats for members of their neighborhood. Or that a community college that had its own preschool could save seats for the children of its teachers and its students. So it would just be wide open, first come, first serve. Or random. And if it, if that were the system, then would the issues in this case simply vanish? Would, I think that the opposing counsel has a number of theories for why they believe that the First Amendment creates a right for publicly funded preschools to deny equal opportunity on the basis of protected class status. So I don't think it would end, it would resolve all of their claims. Speaking of their other claims, I want to briefly identify, address their expressive association claim. Expressive association claim. Before you do, I wanted you to address, please, the temporary waiver provision. I'm struggling a little bit with understanding, I guess, a couple of aspects of this. One is, is the health and safety, the health and safety standard, understanding of the mandate itself. If the mandate qualifies as a health and safety standard, in Colorado's view, because it is focused on promoting or ameliorating students' long-term health and safety, what standard doesn't qualify as a health and safety standard? And how does that inform our understanding of the temporary waiver provision? Yes, there are many standards that are quality standards but are not health and safety standards. To offer a couple of examples, the standard that requires preschools to provide 16 hours of paid leave a year for their teachers to engage in professional development. The standard that requires a certain number of minimum contact hours between professional educators and students over the course of the years. These are examples of quality standards that are deeply important to quality preschool but that are not health and safety standards. And that's what's contemplated by the temporary waiver provision? Yes, Your Honor. The purpose of that provision is to provide extra time to come into compliance for small child care providers or in-home providers who are new to preschool education and need time to come into the quality standards that help them provide high-quality preschool when they've never before provided that. But that provision makes clear that under no circumstances may time be given to a provider to come into compliance with the health and safety standards. And the equal opportunity standards are among the health and safety standards as they have been part and parcel of the program's commitment to safe and healthy learning environments from the program's inception. I see that my time is up. If you want two minutes for the association claim, you can take it and then we'll tag that on as far as rebuttal time so it's equal. Thank you, Your Honor. The expressive association claim requires the plaintiffs to show that the equal opportunity requirements significantly burden their expression. But they can show no such thing. First, the presence of four-year-olds at a school does not significantly interfere with the school's ability to communicate their views. And of course they have them on marriage, sexuality, gender, and more. Four-year-olds, unlike the volunteer adult scoutmasters at issue in Dale, who were, those scoutmasters were expressly charged with communicating and inculcating the scout's values to their members and to the public. Four-year-olds do no such thing. And the Supreme Court has held exactly that in at least two other cases. Why does Dale matter? I'm trying to understand why Dale is relevant to how we would assess this claim. And I'm thinking about Agency for International Development, where Dale seems irrelevant if the mandate is a permissible condition on funding. Is that not a correct way to look at it? Your Honor, those are two different threads. So Dale deals with an expressive association challenge to an equal opportunity requirement. And in fact it's the only in a series of five cases where the court upheld expressive association challenges to equal opportunity. Those were denied in Runyon, in Jaycees, in Duarte, and Rumsfeld. Alliance for an Open Society dealt instead with an unconstitutional conditions claim, a claim not present in this particular case. And the court has made clear that the government has the power to choose what activities it will fund and what activities it will not fund. What the government cannot do is to apply its conditions on a recipient's activities that are not publicly funded. And that's what Alliance for Open Society held, that the government could condition expenditures of federal funding for HIV prevention services on the condition that the recipient not use that money to promote or support prostitution, but that the First Amendment did not permit the government to impose any conditions on that recipient's speech or conduct that was not publicly funded. Here, UPK applies only to participating providers preschool, publicly funded preschool activities. So, for example, it would not apply to plaintiffs K-8 schools. It would not apply if the plaintiffs had homeless shelters or soup kitchens. It applies only to publicly funded preschools. And for this reason, too, a condition on public funding, as the court held in Christian Legal Services v. Martinez, does not significantly burden an expressive association's ability to communicate its views. So you see the Alliance for Open Society framework as a separate, independent path to endorsing your position in this case? If the plaintiffs had raised an unconstitutional conditions claim, Alliance for Open Society explains why that claim should be rejected. Thank you, counsel. Mr. Reeves. And let's add 330 if we can. Wonderful. Thank you. Before you start, let's get the clock straight. I want to be fair on the time. And accordingly, I'll hold you to it. But you have the same amount of time, four minutes, four seconds for rebuttal. Please proceed. Thank you, Your Honor. Just a few quick points. I'd like to start with the congregation exception. You heard defendants come up here and say that preschools are not allowed to use that exception anymore. But if you look at footnote three in our supplemental brief, to this day, there are preschools on Colorado's website that have disclaimers saying we only admit preschool, we only admit families who are part of our congregation. So even if they've gotten rid of a separate congregation exception, that exception has been folded into the broader kind of community preferences, or we call it the catch-all exception, that Colorado created during trial in this case. And in addition to that, I did want to talk about religious discrimination and why favoring some religious groups over others is still problematic under Smith. This Court's decision in Doe's 1-11 and this Court's older decision in Colorado Christian University both talk about interdenominational discrimination. And in those cases, what they say is discriminating in favor of some religious groups over others triggers strict scrutiny under Smith in the same way that favoring secular groups over religious groups does as well. Second, I'd like to talk about comparability very briefly. You know, you heard defendants talking about how exceptions based on religion are different from other exceptions. The government has never articulated different interests it has in these different protected characteristics. If you look at their briefing, all they say is that there are different barriers to access. So someone who has a disability might have a different barrier to access than someone who is low income, for example, but the government interest in equal access is the same across all eight protected characteristics. And they've, in addition, Your Honor, if you look at their briefing before this Court and in oral argument today, they've never actually walked back from the idea that you can give favoritism to historically discriminated against groups. All they've said is that's how they interpret the statute. And if Colorado has the discretion to flexibly interpret this statutory mandate, which on its express terms is very clear in what it requires, if they can flexibly interpret that, that is itself a form of discretion that would violate Fulton. Where do you see that interpretive discretion and flexibility? In the statutory text? I don't think it's in the statutory text, Your Honor. I think what Colorado is doing is they're taking a clear statutory mandate that says you have to provide equal opportunity regardless of any of these protected characteristics. And they're picking and choosing which ones they want to flexibly interpret and say, well, these two are one-way ratchets. We can favor some religious groups over others. We can interpret the statute in a way that allows us to favor historically discriminated against groups. So they're taking a clear statutory requirement and imposing their own flexibility on it because at trial they testified it would be really hard to actually apply this equally to everybody because there are preschools that they want to let into the system. But they're basically using a religious gerrymander to keep the archdiocese preschools out. And, you know, I think on that point, Your Honor, allowing religious preschools to participate would not, or I guess to frame it the other way, we're not asking Colorado to kick out the Head Start programs or kick out any preschools that give preference to disability. All we're saying is that if you give those preferences, you also have to consider religion. Religion is important as well. The First Amendment tells us that. So if you're giving preferences based on disability, you can't say, well, no preferences for religious groups. And finally, for the neutrality point, I would just point this Court to the Sixth Circuit's decision in Merriweather. In that case, what the Court said is that the way in which the government, I've seen my time has expired and I finished my answer briefly. Briefly. Very briefly, Your Honor. The way in which the government applies the law or interprets the law can be evidence of lack of neutrality. Here, Colorado has changed its regulations at least four times during the pendency of this case. And I would just submit that that's another example of lack of neutrality. Thank you, Your Honor. All right. Thank you, counsel. The case is submitted. Counsel are excused. I got us a little bit over time, but an important case and we wanted to hear your arguments. So thank you. Thank you, Your Honor.